Good morning, Your Honors. May it please the Court, I'm Allison Clare, Assistant Federal Defender on behalf of Mr. Roach. As you know, the only issue presented in this case is the voluntariness of Mr. Roach's confession. And I'd like to turn to the particular findings of fact that were made by the Superior Court because it was the trial court in the suppression hearing that conducted the factual inquiry into the voluntariness of the confession. We've identified in the briefs four factual findings that I contend are the only historical or subsidiary facts found that would be entitled to a presumption of correctness as facts. Then we talk about the reasonableness of the legal conclusion that is drawn from those facts. And one of them, which is repeated by the State Court of Appeals and the District Court, is that Mr. Roach was volunteering information about the robberies to get the information off his chest, in the words of the Superior Court. My contention is that if you return to the transcript of the interview, which is at tab 3 of the excerpts, the information which Mr. Roach did volunteer, and I think which we can fairly characterize as having been information he wanted to get off his chest, was not the information about the robberies at all. It was information about his drug relapse. Are you citing two parts of it? In tab 3, page 2, the very second page, is where Mr. Roach initiates the conversation by explaining that he's sick because he's coming off of heroin. Actually, it starts on the very first page, where he says, I feel sick. It's at line 14 of page 1. So that's the very beginning of the interview. And you'll see that Mr. Roach does start talking very freely about the fact that he used to be clean for four years, and he had painkillers after surgery. This caused a relapse, and he's very distressed about his family's economic circumstances. Repeatedly during the course of this transcript, when that is the topic, Mr. Roach is extremely talkative. But I don't think the same is true about the information of the robberies. That is elicited in response to the questions asked by the agents. And so I think that the finding that the information about the robberies was volunteered is not a reasonable factual finding based on this record. As to the friendliness of the interrogation, another factual finding of the State Court, I would certainly not say it's unreasonable to characterize the tone of the questions as friendly, but I would say it's unreasonable to characterize the intent of the interrogation as friendly. As to the mildness of withdrawal, again, it falls on the very first page of the transcript, which is where Mr. Roach is. If we are talking about the external physical manifestations of Mr. Roach's withdrawal from the heroin, even the defense expert testified at the hearing that those symptoms were not severe. However, Dr. Patel also made a distinction between those external manifestations and the subjective mental effects that would go to compliance, suggestibility, and having a will that is easily understood. He talks about the severity. He begins on page 82. We're now in tab 4, which is the transcript of the evidentiary hearing. At the bottom paragraph of page 82 of tab 4, the trial judge refers to Dr. Patel's testimony regarding the stages that an addict goes through after ingesting heroin. And at the top of page 83, he says that Mr. Roach appears to be somewhere in the early state where the withdrawal was intense. This is an unreasonable interpretation of Dr. Patel's testimony, which is at page 70, previous, in those very stages that he was discussing. I'm sorry. I'm trying to stay with you. Show me on page 82, if that's the page I should be on, as to what the unreasonable conclusion is. I'm pointing out that the final paragraph on 82 starts out by citing the evidence from which the superior court judge is drawing his conclusion, which is the description of the stages. Then at the top of page 83, the second paragraph, well, again, up above, he says that Dr. Patel says that this is a progressive phenomenon where, for a few hours, there's mild discomfort, and then it becomes more intense. Okay. So it's that top of the first full paragraph. Yes. And then the first full paragraph on page 83 applies that testimony of Dr. Patel to Mr. Roach, saying he appears... I'm with you. Then if you back up to page 70, where Dr. Patel is testifying about the stages, he refers in the middle of the page, beginning at line 13, to the types of symptoms and the intensity of withdrawal based on the passage of time. And he identifies the early milder symptoms as beginning about two hours after the last administration of the drug. On the opposite end of the spectrum, lines 16 and 17, peak intensity of withdrawal. Now, we know that in this case, the questioning began at 3.30 in the afternoon. Mr. Roach had had his first dose of heroin, his only dose of heroin of the day, in the early morning, which means that he was at least six hours out. So the judge's conclusion that he was in the early mild stages of withdrawal is inconsistent, rather than compelled by Dr. Patel's testimony as to the stages of addiction. So that is further support for the argument in the briefs, which I won't repeat. As to the unreasonableness of the conclusion that Mr. Roach's withdrawal was not severe. Finally, the trial judge held that the police did not withhold aid, and as we've argued in the briefs, while it is true that the officers provided a sandwich and a drink, they repeatedly said the cigarette that you keep asking us for and the attention from a nurse and medication for your pain are things that happen after this interview is over, and the next thing we need, Mr. Roach, is for you to sign these photographs. The next thing we need, Mr. Roach, is for you to talk about this bank on this date. And it's that link consistently between the insistence that Mr. Roach defer getting a cigarette and getting medical attention and the continued questioning about the robberies that constitutes the police coercion in this case. I want briefly, before I reserve some time for rebuttal, to address the harmlessness issue that's come up in the last two hearings, and I'm not going to go into arguments so far, because that question was never reached, the previous courts having not found error in the first instance. And in this case, I would agree with Judge Fletcher's suggestion that because there was no adjudication in the State Court of Harmlessness to which 2254D might apply, we would conduct a Brecht inquiry de novo, as it were. And the admission of this confession, and the jury did have the videotape as well as Deputy Minter's testimony about the crimes, cannot be considered harmless. Certainly, you'd need to do a count-by-count analysis. There are six different robberies, each with a 25-year-to-life sentence attached. And the primary other evidence of Mr. Roach's identity were the in-court identifications by the six tellers, one for each bank. But in reviewing that testimony, and I'll drop a footnote here to point out that in this case, the Attorney General did lodge the entire trial transcript and the videotape with this Court, so it is part of the record. Two out of the six tellers who testified were unable to positively identify Mr. Roach in court, specifically the witness, Jasmine Hardwell. She was the teller for the November 8, 1997 robbery. She testified that she would not recognize the robber if she saw him again. So without the confession, there's insufficient evidence as to that claim. Witness Stacy Boats, who was the teller for the October 9, 1997 robbery, testified that she had, quote, looked familiar. That's that R.T. 285. She also testified that she was focused at the gun and did not get a clear look at his face. So I'd argue that those two are unsupportable without the confession. Two more witnesses, Jackie West and Naomi Seistris from the October 9, 1997 and December 12, 1997 robberies, respectively, both identified the defendant as the robber in court, but were significantly impeached. Ms. West testified that she had actively tried not to look at the robber's face because she did not want to be able to identify him, and she had not picked him out of a photo lineup. Naomi Seistris at first was definite about her in-court I.D., but then it was also brought out on cross-examination that she had been shown a particular photograph of the robber several times before the photo lineup, and that at the time of the robbery itself, she was very emotionally distraught and not looking at his face. The two strongest in-court I.D.s were from witnesses Cara Horner and Kathleen Barraza, both of them also impeachable. Ms. Horner, by possible taint in exposure to a photograph, that's at R.T. 188, and Ms. Barraza had also been previously exposed to photographs, and also there was a stipulation that she had reported to the police that the robber had a foreign accent, and Mr. Roach, of course, did not have an accent. Given those weaknesses in the I.D.s, I would not be deemed harmless. I'll preserve my remaining seconds. Thank you. May it please the Court, Robert Gibson, Deputy Attorney General, State of California, for the respondent of L.A.E. Your Honors, I think that we've covered fairly well the issue here in the briefs, and I'd just like to make a couple of comments in response to counsel's argument here. She points out some of the weakness, or what she feels are the flaws in the findings, or some of the findings, that the trial court made in support of its ruling. Regarding the get-it-off-his-chest comment that the trial court made, I believe that that comment really went to the overall nature of Mr. Roach's attitude regarding this matter. I would like to make a comment, although he said, I want to get this over with regarding the drug addiction and so forth. He was clearly willing and cooperative with the officers, starting with the first contact at his home, where he gave consent to search the home. And that arrest, that contact, by the way, was made about 12.30 p.m., and that cooperation continued on when he got to the police station with this interrogation. This is not a case, as oftentimes you encounter when you're dealing with the voluntariness question on a confession, where officers question or interrogate somebody for a lengthy period of time, who maybe is reluctant or even in denial of what he might be suspected of or accused of at that situation, and then finally breaks down because of the physical weakness in a case like this, maybe the symptoms of withdrawal, finally breaks down and admits his complicity in the crime. What about her point, though, that if you take the medical expert's testimony and juxtapose his description at page 70 against the stage at which the critical information came out, how do you respond to that? I mean, wouldn't it be a little more difficult? I mean, obviously you can look to the externalities, but what's going on within somebody's brain and body system can be masked by lots of things. So what weight or importance do we give to that? Your Honor, you've provided at least part of the answer when you said you have to look at the externality of what's going on. Dr. Patel's testimony was primarily in the abstract. It was about his expertise in the boardroom, and it was primarily about his books he'd written, and in the abstract, what you might expect from somebody who was addicted to heroin. Now, there are various levels of addiction. We have to agree to that, too. As a matter of fact, if you – this is responding to your question, I hope, Your Honor – but if you were to compare, for example, this case with the Kelly case that we cited, in that case, that defendant had a $200-a-day habit. Mr. Roach told the officers he had an $8-a-day habit. The doctor was a man who was testifying with regard to generalities and things in the abstract. And what we had here was a videotape and a transcript of that videotape of the actual interrogation which the doctor viewed, and when it came down to having him testify with regard to Mr. Roach, he was completely unhelpful to Mr. Roach. What he said was, frankly, in all honesty, I don't see any signs of severe withdrawal at all here. I'm showing at R.T., page 74, and the last quoted portion, in all honesty, I can't say that I saw any evidence of severe withdrawal. I don't have something that's tabulated by R.T. and so on. I've got excerpts of record. Okay. You have here a situation where he's cooperative from the get-go, really, and the length of the interrogation I think is hardly a factor here because if you look at both the transcript and the tape, his admission of these robberies came very early on, within the first five to ten minutes of the interrogation, of the questioning, and he admitted his complicity there. And from that point on, it was simply talking about further details. They talked about some of the other uncharged robberies, which, by the way, got edited out of the tape that was given to the jury and so forth. So, you know, I think the first five or ten minutes. Can you point to me? I now have in front of me the transcript of the interview with Officer McCoskey, where he first admitted the robbery. Yes. They're offering him something to drink, something to eat. I'm on page five. Let's see. They make the statement, basically, we've got the surveillance tapes, and we know these happened and we know you did them, and he says, oh, it's on page 11. Page 11, okay. This is Detective Minter at the top. We've got some of your clothes that were worn in some of the bank robberies. We believe the jacket you're wearing right now, you wore in some of the robberies. Uh-huh, he agrees. We want to talk to you about it. We know these things happened. We know that you did them. Okay. Uh-huh. Big thing is why. And then they go on and he starts explaining he needed to pay the bills. Okay. And so, again, we're early on here. It's not a situation where a suspect is essentially beaten down, at least psychologically if not physically, to the point where he confesses. So the issue really is what's his mental state more or less at the beginning of this interview? At the beginning, correct. And I would note, and I've viewed both the videotapes, you have to fast forward through about 45 minutes of his nap because they did allow him to sleep. They got him food. They got him a couple of Pepsis, which he requested. During the course of the entire interview, they took several breaks, at least two of which he was allowed to call home. And these were lengthy phone calls where they left him alone in the interrogation room, et cetera, and indicated during the phone call that he was being treated well. He didn't express any distress to anybody in the phone calls at any time. So, you know, I think that this is a case really where the old adage, I think, applies, and that is a picture is worth a thousand words. Granted, the picture doesn't X-ray the brain and tell us what's going on subjectively in his mind. Or physically within his body. Well, that is going to have to come out through the outward manifestations of what he does. I got it. And there's very little there. And lastly, I'll just conclude with, and I've cited the Kelly case in my argument as well as in the brief, and in the Kelly case, this Court upheld the finding of voluntariness of the confession. Let me just contrast the two cases. I think we're good. Yeah, we know, Kelly. Thank you very much. Thank you. The State ran over it a little bit. Say what you need to say. Okay. I have just two points. The first is that in terms of comparing the dollar amount of the habit with Kelly, that tells us nothing. One is a Sacramento case. The other is from the Southern District of California. We know nothing about the quality of heroin or the market in those areas. You said this is a price differentiation case? No. I don't think we can draw any conclusions from that distinction. The main point I wanted to make had to do with this difference between the subjective mental and physical experiences of withdrawal and the objective identifiable ones. The test for voluntariness is totality of the circumstances. But the two categories of circumstances that are most significant are, on the one hand, the characteristics of the accused, and on the other hand, the conduct of the police. And I understand that coercion is required. However, I think that the subjective experience, which Dr. Patel's testimony supports, the conclusion that there was more going on inside than was obvious outside, that goes to the characteristics of the accused. The objective manifestations of withdrawal are relevant in assessing the conduct of the police. But this is not a case where the police had to merely look at Mr. Roach and make their own determination whether he was in withdrawal. He told them in the first 60 seconds of the conversation. What, should they have just stopped asking any questions? No, to ask some follow-up questions. The passage from Dr. Patel's testimony that opposing counsel and Judge Fletcher were reading aloud together earlier goes on the very next portion is Dr. Patel saying, I was surprised that the FBI agent who said she used to work narcotics didn't ask follow-up questions. To do what? To find out what kind of state he was and if he needed medical attention. So the overreaching or coercion comes in failing to penetrate beyond the objective manifestation? It comes in knowing that the man was already experiencing subjective withdrawal. He said he was sick. And Agent McCosey said that she understood. It comes down to they basically should have stopped questioning. I mean, how are they going to make the fine line distinctions even if they ask follow-up questions? I guess that is what the argument boils down to. They knew that he was already feeling sick and he was only going to get sicker. And by extending the interrogation, they were relying on, this is the inference we would have you draw, relying on the fact he's going to keep feeling sicker in order to get the confession. Okay. Thank you. Thank you very much. Thank you both sides for a helpful argument. The case of Roach v. Garcia is now submitted for decision. The next case on the calendar is United States v. Sandin.
judges: W. Fletcher, Fisher, Winmill